**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| THE CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CV-00245-KOB |
| | ) | |
| GINA GILBERT, THEODORE COOK, and RICHARD RHEA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on Plaintiff Cincinnati Insurance Company's "Motion for Preliminary Injunction." (Doc. 6). Cincinnati seeks a preliminary injunction compelling Defendants Gina Gilbert, Theodore Cook, and Richard Rhea to deposit $2,000,000.00 with Cincinnati to collateralize a loss reserve per the indemnity agreement between the parties. The parties fully briefed the motion, and the court held a hearing on the motion on May 16, 2019.

### I. Background

This case arises from an underlying probate proceeding. The Probate Court for Etowah County, Alabama appointed Ms. Gilbert and Mr. Cook, two siblings, as co-guardians and co-conservators for their mother, Mrs. Patricia Jerome ("the Ward"), on August 1, 2014. As a condition of their appointment as co-conservators, Cincinnati issued a surety bond on their behalf. The bond was signed by Ms. Gilbert, Mr. Cook, and Mr. Rhea—their attorney—as principals, with Cincinnati as the surety. In the bond agreement, the principals agreed to indemnify Cincinnati from any liability, loss, cost, attorneys' fees, and expenses. The bond also included a clause stating that Ms. Gilbert, Mr. Cook, and Mr. Rhea would "[u]pon demand by

1

the Company in the event it deems necessary to establish a reserve, . . . deposit cash funds with the Company in an amount sufficient to satisfy any claim against the Company by reason of such suretyship." (Doc. 1-1 at 4).

On November 10, 2014, Mr. Rhea, on behalf of Mr. Cook and Ms. Gilbert, filed an inventory in the probate court, which represented that the Ward's estate had $8,584,465.23 in assets. On August 28, 2017, Mr. Rhea filed a petition for partial settlement in the probate court. Mr. Rhea included with the petition an affidavit of income and expenditures, which showed that Mr. Cook and Ms. Gilbert spent $6,669,500.96 of the Ward's assets. At that point, the probate court appointed Krystal Padula as guardian ad litem ("GAL") for the Ward.

On February 13, 2018, Andy Cook, another sibling acting as next friend of the Ward, petitioned the Circuit Court for Etowah County to remove the guardianship and conservatorship action from probate court to the circuit court. The court granted that motion on February 16, 2018. Cincinnati received notice of a potential claim against the bond by being named an "interested party" in the circuit court proceeding.

On March 6, 2018, the GAL for the Ward filed a motion to remove Ms. Gilbert and Mr. Cook[1] as conservators. Ms. Gilbert "propose[d] to deposit with the Court certain amount to which the [GAL] and interested parties have made objection thereto," including deposits such as American Express credit card payments totaling $305,899.71, funds from the Ward's e-trade account totaling $760,000.00, and other "[c]onservatorship fees which are pending approval of the Court." (Doc. 1 at 6–7). She ultimately deposited $1,340,899.71 in the circuit court's registry.

---

[1] The court will use "Mr. Cook" to refer only to Defendant Theodore Cook, and not to Andy Cook, to avoid confusion.

Mr. Rhea subsequently withdrew from representing Ms. Gilbert and Mr. Cook on March 20, 2018.

On April 12, 2018, the circuit court accepted Ms. Gilbert's and Mr. Cook's resignations as co-conservators, and appointed a successor conservator. The successor conservator then challenged 567 separate disbursements of the Ward's assets and asserted claims against Ms. Gilbert and Mr. Cook for breach of fiduciary duty, statement of account, conversion, money had and received, claim against interplead funds, and accounting and removal of custodians under the Alabama Uniform Transfers to Minors Act. The successor conservator sought to recover more than $7,615,174.12, including the money already deposited by Ms. Gilbert into the circuit court's recovery, and would seek to recover some or all of those damages from Cincinnati under the surety bond.

On October 29, 2018, Cincinnati sent a letter to Ms. Gilbert, Mr. Cook, and Mr. Rhea reminding them of their obligations under the indemnity agreement and that Cincinnati would require them to deposit collateral to equal the loss reserve once Cincinnati established a loss reserve for the successor conservator's claim against the bond.

Cincinnati established a loss reserve for $2,000,000.00, and sent a letter to the Defendants on December 31, 2018, demanding that they deposit the cash collateral within five business days. The Defendants refused to post the collateral.

Cincinnati filed this action on February 11, 2019, raising three counts: (1) specific performance of the indemnity agreement; (2) breach of the indemnity agreement; and (3) equitable indemnity, reimbursement, and exoneration. (Doc. 1). On March 1, 2019, it filed this motion for preliminary injunction seeking the court to compel the Defendants to post $2,000,000 to equal the loss reserve Cincinnati established. (Doc. 6).

## II. Discussion

Cincinnati seeks extraordinary relief in moving for a preliminary injunction. *See Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) ("We begin our analysis with the unremarkable observation that a preliminary injunction in advance of trial is an extraordinary remedy."). But "[t]he purpose of the preliminary injunction is to preserve the positions of the parties as best [the court] can until a trial on the merits may be held." *Id.*

The court uses a four-part test to determine if a preliminary injunction is appropriate. The plaintiff must clearly establish:

> (1) [the plaintiff] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). The court will discuss each requirement in turn.

### A. Substantial likelihood of success on the merits

The court first considers whether Cincinnati has a substantial likelihood of success on the merits of the complaint, in which it seeks specific performance of the Defendants' duty to collateralize Cincinnati under the bond.

To succeed on a claim for specific performance of a contract, a party must have no adequate remedy at law. *See Gen. Sec. Corp. v. Welton*, 135 So. 329, 331 (Ala. 1931) ("[E]quity will decree the specific performance of a contract whenever it is made to appear that an action at law for damages would be an inadequate or impracticable remedy."). And "[c]ase law nationwide has recognized the right of a surety to use the equitable remedy of specific

enforcement to secure collateralization of its right to indemnification of the principal's debt." *Auto-Owners Ins. v. Randy B. Terry, Inc.*, No. 5:12-CV-02717-TMP, 2013 WL 6583959, at *6 (N.D. Ala. Dec. 16, 2013) (Proctor, J.) (accepting Judge Putnam's Report and Recommendation).

But the Eleventh Circuit has held that "a district court lacks the authority to issue a preliminary injunction freezing the assets of a defendant in a case seeking only money damages." *Rosen v. Cascade Int'l Inc.*, 21 F.3d 1520, 1531 (11th Cir. 1994). However in this case, Cincinnati does not seek money damages. Instead, it seeks the enforcement of a contract that required the Defendants to post collateral to fulfill the loss reserve established by Cincinnati in the event of a claim against the bond. While the enforcement would require the exchanging of money, this money is not sought as damages, but as Cincinnati's bargained-for contractual right.

The entire point of the collateral reserve provision in the bond agreement is to ensure that any money Cincinnati must pay in damages under the bond comes first from the indemnitors— not from Cincinnati's own pocket. If the court does not require the indemnitors to deposit the requisite funds into the loss reserve established by Cincinnati and instead forces Cincinnati to pay damages out of pocket because it can be reimbursed later by damages for breach of contract, then Cincinnati has lost the benefit of the bargain under its loss reserve clause.

This court agrees with its colleagues, Judge Proctor and Judge Putnam: "The legal remedy of a money judgment is not adequate to enforce the surety's negotiated right to collateralization of its indemnification; specific performance is required." *Auto-Owners Ins.*, 2013 WL 6583959, at *7.

Ms. Gilbert contends that a different opinion by Judge Proctor—written in the same year as his *Auto-Owners Insurance* opinion—holds that an insurance company does not lack an adequate remedy at law when the insured fails to deposit collateral for anticipated losses. *See*

*Hanover Ins.*, 946 F. Supp. 2d 1208. This case is inapposite. In *Hanover Insurance*, the insurance company moved for summary judgment, not a preliminary injunction. And the type of surety in *Hanover Insurance* differs from our case; the surety in *Hanover Insurance* protected a construction contractor, whereas the surety agreement in our case protected a fiduciary of an estate. Further, Judge Proctor denied the insurance company's motion for summary judgment in part because the company "offered no evidence demonstrating why its remedies at law are inadequate." *Id.* at 1223.

But in our case, Cincinnati has offered evidence to that effect. The affidavit of Elizabeth Carley, Superintendent of Bond Claims for Cincinnati, explains the claims currently against the bond, the Defendants' refusal—and inability—to pay the collateral, and Cincinnati's lack of alternative remedy apart from specific performance. (Doc. 8). So the court does not find persuasive Ms. Gilbert's argument that Judge Proctor contradicted his own determination that the surety lacks an adequate remedy at law when the indemnitor fails to post collateral pursuant to a bargained-for loss reserve clause.

So, the court finds that Cincinnati does have a substantial likelihood of success on the merits for specific performance of the contract because it lacks an adequate remedy at law.

To the extent Mr. Cook contends that Cincinnati lacks substantial likelihood of success on the merits because Cincinnati seeks both specific performance of the indemnity agreement *and* equitable indemnification, the court finds this argument unpersuasive. Mr. Cook correctly asserts that Cincinnati cannot recover for both specific performance *and* equitable indemnification for the same indemnity issue. *See Hanover Ins. v. Hudak & Dawson Const.*, 946 F. Supp. 2d 1208, 1219 (N.D. Ala. 2013) (Proctor, J.) ("Here, however, because the parties entered into Agreements of Indemnity, Plaintiff may not rely on a common law theory of

indemnification."). But Cincinnati admits that it only included equitable indemnification in its complaint as an alternate pleading in the event that the court found a problem with the indemnity agreement. (Doc. 21 at 3). So, that Cincinnati pled both equitable indemnification and specific performance does not affect Cincinnati's likelihood of success on the merits, as Cincinnati does have a substantial likelihood of success on the merits for specific performance.

And to the extent Ms. Gilbert contends that Cincinnati lacks substantial likelihood of success on the merits because Cincinnati settled with the successor conservator in the underlying matter in its own personal interest, that settlement has no bearing on Ms. Gilbert's contractual agreement with Cincinnati to collateralize a loss reserve. Mr. Rhea makes a similar argument: that the loss reserve does not apply to him because he did not commit any wrongdoing. But any finding of wrongdoing regarding the administration of the estate is in the purview of the state court action. This court is not tasked with determining the fiduciary duties and administration of the Ward's estate. This court is only asked to enforce the surety contract, in which Mr. Rhea voluntarily agreed to establish a loss reserve in the event of a claim, regardless of any alleged wrongdoing.

### B. Irreparable harm

Next, Cincinnati must establish that it will suffer irreparable harm if the court does not grant the proposed injunction. Related to its argument for lacking an adequate remedy at law, Cincinnati contends that it will suffer irreparable harm because it will be deprived of its bargained-for contractual right to receive and hold funds from the indemnitors to establish a loss reserve. The collateralized loss reserve protects Cincinnati from first using its own funds to pay damages under the bond by requiring the indemnitors to post the collateral when Cincinnati establishes the fund after notification of a claim against the bond.

The Defendants argue that Cincinnati will not suffer irreparable harm because Cincinnati's only injury, if the court does not grant the preliminary injunction, would be monetary. And "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).

But the Defendants' position takes a much too simplistic view of the harm Cincinnati would suffer. If the Defendants are not required to deposit money to fulfill the loss reserve established by Cincinnati, Cincinnati would indeed suffer some monetary harm. If the successor conservator secures damages against Ms. Gilbert and Mr. Cook, then under the bond, Cincinnati would be obligated to pay those damages. And if the loss reserve has not been filled, Cincinnati must pay those damages out of pocket. But the Defendants later reimbursing Cincinnati for the money it paid would not undo the damage done. The Defendants agreed to deposit collateral if Cincinnati established a loss reserve—and in whatever amount Cincinnati deemed necessary based on the claim made against the bond—when they voluntarily entered into the surety agreement. If the court does not enter this preliminary injunction, Cincinnati's bargained-for right to the collateralization of the loss reserve will be forever lost, regardless of whether the Defendants later pay $2,000,000 to Cincinnati.

The purpose of such a loss reserve clause is greater than just the money itself. Cincinnati is in the business of insurance. If Cincinnati merely agreed to fully indemnify anyone who signed a bond agreement without ever requiring that party to post collateral, then that party would have no incentive to avoid being sued because Cincinnati would simply pay the damages. This phenomenon is known as moral hazard:

> If [the insured's] risk is completely eliminated through transfer to [the insurer], [the insured] might have less incentive to take measures that prevent the loss from

occurring or minimize the effect of loss once it occurs. Thus, the existence of insurance can have the perverse effect of increasing the probability of loss. . . .

. . . .

To deal with the moral hazard phenomenon, in most insurance transactions the insured retains some responsibility for the risk through either a *deductible* or *coinsurance*.

Robert H. Jerry II, *Understanding Insurance Law* 14–15 (2d ed. 1996). In the surety context, rather than establishing a deductible or coinsurance, the surety ensures that the indemnitor retains some responsibility, and thus reduces the moral hazard, by requiring the indemnitor to collateralize a loss reserve. If the court does not grant this preliminary injunction, Cincinnati then loses its bargained-for right to a collateralized loss reserve, which in turn increases Cincinnati's exposure by increasing the moral hazard.

Other judges in the Northern District of Alabama have held that monetary damages are insufficient to repair the harm from an indemnitor's refusal to collateralize a loss reserve established by the surety. In addition to Judge Putnam and Judge Proctor, as discussed above regarding the inadequacy of a remedy at law in this situation, Judge Axon has similarly held that the surety would "lose the benefit of its bargain absent an injunction" requiring the indemnitor to collateralize the loss reserve. *See SureTec Ins. v. Eternity LLC*, No. 1:18-CV-1247-ACA, 2018 WL 6001103, at *3 (N.D. Ala. Nov. 15, 2018) (Axon, J.). Judge Axon noted that "absent an injunction, [the surety] would suffer the harm of having its rights under the Indemnity Agreement effectively nullified. [The surety] would be unsecured against claims and loss while [the indemnitors] would be free to sell, transfer, or conceal their assets to avoid their obligations." *Id.* (quoting *Developers Sur. & Indem. v. Bi-Tech Constr., Inc.*, 964 F. Supp. 2d 1304, 1310 (S.D. Fla. 2013)).

This court agrees with Judge Axon, Judge Proctor, and Judge Putnam that a surety would suffer irreparable harm if its indemnitors were permitted to ignore the contractual provision requiring the indemnitor to collateralize a loss reserve for the benefit of the surety. So, Cincinnati has established irreparable harm.

### C. Injury to movant outweighs harm to non-movants

Cincinnati must establish that the irreparable harm it would suffer absent an injunction outweighs any harm that the proposed injunction would cause Ms. Gilbert, Mr. Cook, and Mr. Rhea.

As already noted, Cincinnati has established that it would suffer irreparable harm if the court does not grant the proposed injunction. On the other hand, Ms. Gilbert, Mr. Cook, and Mr. Rhea all contend that they would suffer extreme financial harm if compelled to jointly and severally post $2,000,000 in collateral. Simply put, they do not have the money to comply with the proposed injunction.

Generally, federal courts find that a defendant is not harmed when he is required to comply with a contractual provision to which he voluntarily agreed. *See SureTec Ins.*, 2018 WL 6001103, at *3 ("[D]efendants 'are not unfairly prejudiced by being held to the agreement to indemnify [SureTec] to which they are signatories.'" (quoting *Hartford Fire Ins. v. 3i Constr., LLC*, No. 3:16-CV-00992-M, 2017 WL 3209522, at *4 (N.D. Tex. May 15, 2017))); *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2017 WL 9360906, at *12 (W.D. Tex. Aug. 2, 2017) ("[I]f Defendants are required to post collateral security here, they are merely being required to perform pursuant to the terms of the otherwise undisputedly clear and valid Indemnity Agreement to which they are a party . . . ."). As noted by the Middle District of Georgia, "[a]lthough Defendants may suffer harm as a result of this injunction, this harm is the

result of enforcement of an Indemnity Agreement which Defendants entered; an injunction would only require Defendants to do that which they agreed to do." *Hanover Ins. v. Holley Const. Co. & Assocs.*, No. 4:11-CV-41 (CDL), 2012 WL 398135, at *6 (M.D. Ga. Feb. 7, 2012).

The court is sympathetic to the Defendants' contentions that they will face extreme financial hardships if forced to post the collateral—particularly to Mr. Rhea, who was merely counsel for the co-conservators when he signed the bond, purportedly at the direction of the state court judge. But the Defendants all agreed to collateralize the loss reserve in whatever amount Cincinnati established as sufficient depending on the claim against the bond.

Mr. Rhea cites only one case for his financial hardship argument—a Middle District of Florida case. *See Alternative Med. Integration Grp., L.P. v. Langford*, No. 8:13-cv-2909-T-33AEP, 2014 WL 12572738 (M.D. Fla. Aug. 1, 2014). But the case Mr. Rhea cites is significantly different from ours. In *Langford*, the court found that the plaintiff failed to establish *each* requirement for a preliminary injunction—including irreparable harm. As previously discussed, Cincinnati would indeed suffer irreparable harm. Further, in *Langford*, the defendant had no contractual obligation to collateralize the plaintiff, the defendant's employer. But in our case, Mr. Rhea voluntarily signed a contract stating that he would so collateralize Cincinnati. That contract holds weight, even if Mr. Rhea is financially unable to complete his contractual obligations.

So, the court finds that the balance of harms rests in favor of Cincinnati.

**D. Public interest**

Finally, Cincinnati must establish that the injunction would not be adverse to the public interest. Cincinnati contends that Alabama law "requires a court to enforce an unambiguous,

lawful contract, as it is written." *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). So upholding Alabama contract law is certainly in line with the public interest.

Further, requiring indemnitors to collateralize their sureties in compliance with their contractual obligations helps to maintain the solvency of surety companies. And maintaining the solvency of surety companies supports the insurance industry, which supports the public interest at large. *See SureTec Ins.*, 2018 WL 6001103, at *3 ("[T]he 'requested injunction comports with the public interest in enforcing contracts and maintaining the solvency of surety companies that support public construction projects.'" (quoting *Developers Sur. & Indem.*, 964 F. Supp. 2d at 1310)).

Beyond maintaining the solvency of surety companies, granting the proposed injunction also aids the insurance industry and the general public by decreasing moral hazard. By requiring a fiduciary to collateralize the loss reserve per the terms of the bond agreement, the fiduciary has "skin in the game." This incentivizes the fiduciary to increase the integrity with which it approaches its duties; if the fiduciary is sued, it must collateralize the loss reserve even before a finding of wrongdoing. If the fiduciary was fully insured without needing to retain some responsibility, such as through an uncollateralized loss reserve, then it would be free to disregard its duties because its insurer would simply clean up the mess after the fact with no additional cost to the fiduciary. Thus, moral hazard would increase at the expense of insurance companies. The increase in moral hazard in the world of probate would then be felt heavily by wards and estate to which fiduciaries shirk their duties and hide behind bonds.

So, the court finds that the proposed injunction would not be adverse to the public interest; rather, it would support the public interest by enforcing an unambiguous contract as written, supporting the solvency of surety companies, and decreasing moral hazard.

**III. Conclusion**

Because Cincinnati has clearly established each requirement for a preliminary injunction, the court GRANTS the motion for preliminary injunction. (Doc. 6). The court ORDERS Defendants to jointly and severally deposit $2,000,000 with Cincinnati to establish a collateral reserve.

**DONE** and **ORDERED** this 18th day of June, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE